UNITED STATES DISTRICT COURT
EASTERN DISTRICTOF MICHIGAN-SOUTHERN DIVISION

| | |
|---|---|
| PEARLIE JACKSON, Personal Representative of the Estate of Stanley Jackson, | ) ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 12-cv-10963 ) |
| WASHTENAW COUNTY, DEPUTY THOMAS MERCURE, DEPUTY DEAN REICH, DEPUTY SEAN URBAN, DEPUTY HOLLY FARMER, | ) ) ) ) ) ) |
| Defendants. | ) ) |

## Preliminary Expert Report of John J. Ryan

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island, a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island, and a Juris Doctor Degree from Suffolk University Law School.

1

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity, I was responsible for graduate courses on Constitutional Issues in Law Enforcement, Police Misconduct/Civil Liability, Managing Police Organizations, Contemporary Issues in the Justice Field, Juvenile Justice, Mental Health Law, and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001, Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation, 2007, 2010 and 2013 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations, 2009.

2

5. I also author an annual publication for law enforcement officers entitled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations. This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, G. Patrick Gallagher and Lou Reiter. In that capacity, I author and edit the institute's legal update service for law enforcement. This update service and an archive of all articles that I have written can be found at www.patc.com.

7. As part of the Legal and Liability Risk Management Institute, I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations. As part of these reviews, I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges. I have provided training in the following areas:

      a. Policy development for public safety agencies.

      b. Legal Issues in police use of force.

3

c.  Legal Issues in internal affairs investigations.

d.  Police misconduct/civil liability.

e.  Legal/Liability Issues in Narcotics Operations.

f.  Arrest, Search and Seizure, & Interrogation.

g.  Racial profiling.

h.  Legal issues in public schools.

i.  Media relations for public safety agencies.

j.  Constitutional update for law enforcement officers.

k.  Basic training for detectives.

l.  Law enforcement officers' bill of rights/due process in administrative investigations.

m.  Legal/policy and decision making factors in law enforcement pursuits including use of force/intervention tactics.

n.  Legal and policy Issues for hostage negotiators.

o.  Legal and liability issues for SWAT operations

p.  Legal and liability issues for jails

q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9. I am a former police Captain of the Providence Police Department in Providence, Rhode Island, where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public

4

Affairs, and Director of the Department's Administrative Staff. During most of my career, I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, civil liability for law enforcement agencies and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers. Participants in these courses have come from thousands of law enforcement agencies around the United States. Officers in attendance have come from departments with less than ten sworn officers to departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force, including inter alia, dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody,

5

Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, and dealing with the mentally ill.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk

6

managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session of Georgetown Law Center's annual §1983 Civil Rights Litigation program.  I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.  I have been published annually in materials from Georgetown Law Center related to this program.  The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007, I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

7

24. In 2007, 2008, 2009 and 2012, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program. My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600), "Recent Developments in the Use of Excessive Force by Law Enforcement," Karen Blum/Jack Ryan. It is noted that my materials have been included in their annual publication related to this program.

25. In 2008, I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009, I was a featured speaker for the national conference for public risk managers.

27. In 2009, I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009, I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009, I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law

enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker that the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012, I developed a training program for law enforcement and attorneys dealing with use of force, electronic control devices, and sudden custody death. This program, which I am presenting throughout the United States, is accompanied by a text manual which I wrote and is also being distributed nationwide.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012, I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers

from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.

38. My experience, training and background are more fully described in the attached curriculum vitae which I incorporate by reference to this report.

39. I have reviewed the following materials to date regarding this case:

    a. Complaint
    b. In-Custody Death Investigation-Michigan State Police (MSP Inv.)
    c. 911 call for service
    d. MSP 2002 report no 026-0002853-02
    e. MSP report no 025-0003468-10
    f. MSP report no 026-0004185-10
    g. MSP report no LWN-0000278-10
    h. Photographs
    i. Prosecutor Review 1-6-2011
    j. WCSO Use of Force Policy
    k. WCSO TASER Policy
    l. Search Warrant Affidavit 8-24-2010
    m. St. Joseph Hospital records
    n. St. Joseph Hospital security records
    o. TASER downloads
    p. University of Michigan Pathology reports
    q. WCSO incident reports (arrest reports)
    r. Prosecutor Reports (prosecution reports)
    s. Audio from MVR
    t. Documents Responsive to Plaintiff's 1st Request for Production of Documents
        1. Death Investigation
        2. Personnel Files of Deputies
        3. TASER purchase materials and study
        4. RFP TASER Purchase
        5. Training/Instruction Materials/TASER
        6. WCSO Policies

7. Training Files of Deputies
8. Investigation/Discipline/Claims documents
9. Insurance Policy
10. CBA
11. Electronic Version of TASER training materials
12. Public Statements made by WCSO re: Jackson

40. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

41. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

42. The law enforcement event reviewed for this report occurred in Washtenaw County, Michigan, on Friday August 20, 2010. At approximately 5:00 p.m., deputies of the Washtenaw County Sheriff's Office (WCSO) were called to assist Detective Marocco of LAWNET, who was conducting a surveillance for drug activity at 8707 Heather Drive, Superior Township. (MSP Inv.). Detective

11

Marocco advised that he wanted assistance in stopping Stanley Jackson. (MSP Inv.).

43. Sean Urban reported that he, followed by Deputy Mercure, approached 8707 Heather Drive along with Detective Marocco. (MSP Inv.). Urban was driving a fully marked sheriff's vehicle and wearing his uniform. (MSP Inv.). On his approach Deputy Urban observed Jackson and a second subject standing in the driveway. (MSP Inv.) Urban noted that both individuals looked at him as he exited his fully marked vehicle. (MSP Inv.). As Urban approached, Jackson reached for his waistband and began to back away toward the open garage. (MSP Inv.). Deputy Urban reported that he gave Jackson verbal commands to stop and a TASER warning. (MSP inv.). Jackson fled into the house and attempted to shut the door with Urban in pursuit. (MSP inv.). Deputy Mercure reported that he stopped and secured the second subject in the driveway until Detective Marocco took control of the subject. (MSP Inv.).

44. Deputy Urban reported that Jackson proceeded through the kitchen and toward the living room, at all times keeping his hands by his waistband. (MSP Inv.). As Jackson neared the living room, Urban observed him stop and begin to turn in Urban's direction. (MSP Inv.). It is noted that at this point, Deputy Urban was the only law enforcement officer in the house. Deputy Urban asserted that he was fearful that Jackson was pulling a weapon from his waistband at which point Urban deployed his TASER which he had in his hand. (MSP Inv.). Urban noted a successful deployment.

12

45. When joined by Deputy Mercure, Urban and Mercure moved in to handcuff Jackson while he was under the effects of the deployment. (MSP Inv.). Each of the deputies took out a set of handcuffs and Mercure got one cuff attached to Jackson's right arm while Urban got one attached to Jackson's left arm, however, Jackson continued resisting the deputies' efforts to link the two sets together. (MSP Inv.).

46. Deputy Farmer reported that at one point in the fight, Jackson was able to get his right hand free with an open cuff which could have caused significant injury if striking a deputy. (MSP Inv.). Farmer also reported that Jackson tried to bite her. (MSP Inv.).

47. Deputy Urban reported that Jackson continued trying to get away from the deputies, at which point Deputy Mercure used the TASER in the drive-stun mode in an effort to gain compliance. (MSP Inv.). Mercure reported that the air cartridge was removed from the TASER prior to his drive stun. (MSP Inv.). Urban reported that the drive-stun by Mercure seemed to have no impact on Jackson. (MSP Inv.). Urban reported that he too tried a single drive-stun on Jackson, which did not appear to have any impact. (MSP Inv.). Deputy Urban reported that the deputies finally got Jackson secure by linking the left handcuff to Jackson's belt which then allowed them to secure the right handcuff. (MSP Inv.).

48. Urban reported that following the restraint of Jackson, the deputies attempted to seat him upright against the refrigerator however Jackson continued making aggressive movements on the floor. (MSP Inv.). HVA (Huron Valley

13

Ambulance) medical personnel, Tony Lyssiotis and Lee French responded to the scene and transported Jackson to the hospital. (MSP Inv.).  Superior Fire Department also responded to the scene. (MSP Inv.).  It is noted that the HVA run sheet indicated that the call was received at 1656:01; dispatched at 1656:21; and on scene at 1702:39 with patient contact at 1704:00. (MSP Inv.).

49. Deputy Sean Urban's TASER was downloaded and the data showed two five second deployments. [17:05:37-end of cycle] and [17:11:02-end of cycle]. (MSP Inv.]  Deputy Thomas Mercure's TASER was downloaded and the data showed two deployments, one 3 second deployment and one 5 second deployment. [17:04:41-end of cycle-3 seconds] and [17:04:53-end of cycle-5 seconds] (MSP Inv.).  According to the autopsy report Jackson had two abrasions to the "right lateral inferior abdomen" consistent with TASER probe perforations. (MSP Inv.).  Jackson had burn marks on his back consistent with TASER. (MSP Inv.).

50. It is noted in the clinical history section of the medical examiner's report that Jackson is seen "on camera to be alert and moving during the evacuation at 1716 hours. (MSP Inv.).  Additionally it was noted in the medical examiner's report that while in the emergency room, Jackson was alert and oriented but continued to be agitated, aggressive, and combative. (MSP Inv.).  According to Emergency Room Progress notes performed by Kristen Paulson, RN: "Two representatives from security were in the room, two ED techs, an EMT student, 2 nurses, and the 2 EMT's were all needed to keep the patient on stretcher." (MSP Inv.).

51. Several security officers at Saint Joseph's hospital were interviewed by the Michigan State Police. (MSP Inv.).  Danielle Weir reported that when she and

14

Officer Bates met the transporting HVA "rig," Jackson was restrained but combative, vigorously banging his back on the gurney and screaming. (MSP Inv.) Weir reported that Jackson calmed as they brought him into the hospital but as they moved him to a hospital bed from the gurney, Jackson began fighting and wrestling with the hospital security officers. (MSP Inv.). Weir also reported that a spit mask was put on Jackson and he was given "Ativan." (MSP Inv.).

52. Security Officer Joseph Zaccaria reported that he observed Jackson squirming and combative. (MSP Inv.). Zaccaria further reported that Jackson was in leg restraints and Dr. Borada (sic)[assumed to be Bora] ordered that Jackson be put in four-point restraints by hospital personnel. (MSP Inv.).

53. Security Officer John Jungling responded to the ER entrance after being notified by radio that a combative subject was being brought in by HVA and should arrive within five minutes. (MSP Inv.). Jungling reported that Jackson was already in Room 38 when he arrived and that Jackson was fighting and spitting. (MSP Inv.). Jungling asserted that due to Jackson's spitting, a spit mask was put on him and a sheet was used to block the spit. (MSP Inv.).

54. Security Officer Bates similarly reported a fighting Jackson in the ER. (MSP Inv.). Bates observed that Jackson was tied to the HVA gurney at the elbows. (MSP Inv.). Bates reported that once Jackson was on the hospital bed, his legs were restrained and the officers tried to remove the handcuffs but were unable to due to Jackson's fighting. (MSP Inv.) Unable to remove the handcuffs, Bates said they laid him back down with the handcuffs still on. (MSP Inv.) It was at this point that Bates observed Nurse Kristen Paulson give Jackson a shot of what

Bates believed to be Ativan. (MSP Inv.)  According to Bates, after the injection Jackson seemed to calm down and as officers lifted Jackson to try and remove the handcuffs, Jackson's head slumped and someone questioned whether he was still breathing. (MSP Inv.).  Jackson was pronounced dead at 18:20 hours nearly an hour after arriving at the hospital [17:26]. (MSP Inv.).

55. At the time of this interaction with law enforcement, Stanley Jackson was wearing an ankle tether due to prior criminal charges. (MSP Inv.).  Jackson had been placed on probation for a delivering cocaine and heroin in January of 2010, and had been charged with delivery of cocaine and heroin in August of 2010. (MSP Inv.).

56. It is my opinion, based upon my specialized background, training, experience, and education as well as my continued research, writing, auditing, training, and consulting on law enforcement practices nationwide that the use of force on Stanley Jackson by the deputies was consistent with generally accepted policies, practices, training, and legal mandates with respect to use of force.

57. Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification.  The first of these formulas is a three-part test which parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[1]  The three-part test directs officers to consider the seriousness of offense, whether or not the subject poses a physical

---

[1] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States.  See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

16

threat to the officer or anyone else, and whether the subject is actively resisting or attempting to evade arrest by flight.

58. It is clear from a review of the Washtenaw County Sheriff's Officer Use of Force Policy, that the policy is consistent with generally accepted policies, practices, training, and legal mandates with respect to use of force by law enforcement officers. The policy directs officers to consider the seriousness of the offense; physical threat factors; and the subject's resistance. In addition the policy also directs officers to consider the level of proof that an officer has established to believe the subject is involved in the crime suspected. A review of the WCSO TASER/Use of Force Policy also leads to my opinion that this policy is consistent with generally accepted policies, practices, training, and legal mandates on the use of force generally and the use of a TASER specifically. The policy clearly directs officers to balance the need for additional cycles against the need to safely apprehend the subject.

59. In accord with the materials presented the officers were assisting in a narcotics operation and where a narcotics investigator requested assistance in stopping Stanley Jackson. Officers who are asked to seize an individual by another officer, can rely on the knowledge of the other officer as justification for the seizure.[2]

60. All officers are trained that a suspect cannot defeat an officer's ability to make an arrest by retreating into a residence. The concept of hot/fresh pursuit is trained to officers and is also the subject of numerous United States Supreme

---

[2] See e.g. Law Enforcement Officer's Pocket Manual, §2.2.1.1 "If the information comes from a reliable source, it may be enough by itself to justify a stop. Other police officers and citizen witnesses or crime victims are generally considered reliable sources." Bloomberg BNA, www.bna.com 2013.

17

Court decisions which are trained to officers. It is my conclusion and opinion that any reasonable and well trained officer would have recognized the justification for pursuing Jackson into the residence. Additionally, a reasonable and well trained officer would have recognized that allowing Jackson into the residence without a law enforcement officer at his elbow or on his heels would have further escalated this event.

61. Narcotics, particularly narcotics dealing, is a serious crime. Law enforcement training warns officers that guns and drugs go hand in hand and thus they should be aware that individuals who are dealing narcotics may be armed.[3] According to the materials presented to date, Stanley Jackson, who fled from the officers despite verbal commands to stop, continually reached to his waistband. Any reasonable and well trained officer would recognize the seriousness of this event was escalated as Jackson fled, while at the same time reaching for his waistband.

62. Jackson also posed a dramatic physical threat to Deputy Urban as he fled. The physical threat escalated as Jackson reached for his waistband and escalated further as Jackson stopped and turned toward the officer. The sudden stop and turn constituted a well-known dual-threat. First, Deputy Urban was concerned that Jackson was turning with a weapon. It is well-known in law enforcement that some individuals will take flight or fight when confronted by law enforcement. Officers are trained that individuals who are unable to get away will sometimes then transition to a fight. Here, it is undisputed that Jackson fled into his home upon seeing law enforcement officers and that he turned to face

---

[3] See e.g., *United States v. Salas-Garcia*, 698 F.3d 1242 (10th Cir. 2012).

Deputy Urban in the house. (Complaint). Deputy Mercure was not initially with Deputy Urban as he had stopped to assist in securing the other subject in the driveway.

63. A second threat occurred when Jackson stopped in the house and turned toward Deputy Urban, heightening the threat by putting the officer in the position of going hands-on with a fleeing and resistant subject. Officers throughout the United States are trained with respect to the danger of going hands on with a violent subject. It is recognized that close-quarters, hands on conduct with a violent an unpredictable subject brings the officer's weapon within the reach of the subject and increases the level of danger to anyone in the area of the event.[4]

64. Clearly, Jackson's decision to run from uniformed officers constituted active resistance to the officers' efforts to stop him. This resistance was further escalated by his reaching to his waistband during his sudden stop and turn toward the officer.

65. The second formula was the "Use of Force Continuum." While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusions, such as officer presence and verbal commands, to the highest level which is deadly force. It should be recognized that even in those agencies which still utilize a use of force continuum, the continuum is not a ladder which must be climbed step by step. Instead, it is a presentation of various force options, each of which must be objectively reasonable under the

---

[4] See, IACP "Use of Force" Concept Paper: "Statistics on police officers killed feloniously over more than a decade reveal that about 15 percent of police homicides were perpetrated by assailants using the officer's own handgun."

circumstances faced by the officer. Due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options." It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision making model.

66. Deputy Urban and Deputy Mercure approached Jackson's home in fully-marked law enforcement vehicles and wearing identifiable law enforcement uniforms. As such, the officers established officer presence as they approached Mr. Jackson. Law enforcement training teaches that most individuals including those committing criminal acts, bring their conduct into compliance with what is expected under the law upon seeing a law enforcement officer. As such, in most cases physical force is unnecessary. It is noted that Deputy Urban also reported that he gave verbal commands to Jackson as Jackson backed toward the house while reaching for his waistband.

67. Command presence and verbal commands are considered the least significant force options available to an officer. Officers are further trained that when these options fail to bring about compliance, the officer is justified in escalating to a more significant force option. Officers are trained that the force option chosen must be reasonable in light of the circumstances they face. It is noted that many agencies consider pepper-spray and TASER to be the next options available to an officer when presence and verbal commands fail and there is active resistance.

20

68. At the time Deputy Urban deployed his TASER in the probe mode, he was pursuing an individual who had not complied with officer presence and verbal commands, who was reaching for his waistband as he ran, who was suspected of dealing in narcotics, and who suddenly stopped and turned toward the deputy. Any reasonable and well trained officer would have concluded that it was consistent with generally accepted policies, practices, training, and legal mandates to deploy the TASER in the probe mode when faced with such circumstances. Urban's use of the TASER in the probe mode under the circumstances detailed in the materials was consistent with generally accepted policies, practices, training, and legal mandates with respect to use of force generally and TASER specifically.

69. In the probe mode, the TASER causes neuromuscular disruption which incapacitates a subject during the deployment when successfully deployed. Officers are trained that during the deployment available officers should move in and "cuff under power" where it is safe to do so. (TASER Training Version 18). It is clear from the materials provided to date that the deputies immediately moved in to restrain Jackson. The officers described Jackson's continued resistance and their initial inability to accomplish restraint, even using two pairs of handcuffs in this effort.

70. Due to this continued resistance, Deputy Urban used his TASER in the drive-stun mode one time and Deputy Mercure's TASER registered one three second output and one five second output. It is noted that in the drive-stun mode, the

21

TASER does not cause complete muscular disruption or an uncontrolled fall, but rather causes localized pain only.

71. At one point during Mr. Jackson's resistance to being handcuffed he was able to free one arm with a cuff attached but the second one free. All officers are taught of the extreme danger which occurs if an individual as able to swing a loose handcuff and strike an officer. The officers were finally able to restrain Jackson by handcuffing him to his own belt.

72. Any reasonable and well-trained officer would conclude that the three TASER discharges in the drive-stun mode on a subject whose continued physical resistance prevented the deputies from accomplishing restraint was proper and consistent with generally accepted policies, practices, training, and legal mandates with respect to use of force generally and TASER specifically. It is my opinion that the three TASER discharges in the drive-stun mode was consistent with all generally accepted policies, practices, training, and legal mandates with respect to use of force generally and TASER specifically.

73. It is noted that Deputy Farmer reported deploying a quick jab to Mr. Jackson as Jackson tried to bite her. It is my opinion that this type of strike to ward off a bite was consistent with generally accepted policies, practices, training, and legal mandates on a law enforcement officer's use of force.

74. In accordance with the materials presented, it is clear that the deputies used force to accomplish control of Jackson through handcuffing. Notwithstanding Jackson's continued active resistance, the deputies used no additional force once restraint was accomplished.

75. Although the complaint alleges deficiencies on the part of the county in screening, hiring, training and employing professional deputies and a particular deficiency in TASER training as well as a deficiency in investigating misconduct and discipline, I cannot find one bit of evidence in the materials I have been provided to date to support such a claim. In fact, a review of training and personnel files provided are contrary to the allegations made in the complaint and I am of the opinion that Washtenaw County hiring, training and discipline are consistent with generally accepted practices nationwide.

76. At this stage of my review I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

77. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

78. My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 3rd day of September 2013, in Greenville, Rhode Island.

John J. Ryan

23