## Ernest Burwell

## Police Consulting

## P.O. Box 2083

## Thompson Falls, Montana 59873

## 406-531-9223

## ewbk94@gmail.com

To: Attorney Gordana Misovski
Romano Law, P.L.L.C.
26555 Evergreen Road, Suite 1500
Southfield, Michigan 48076
Phone: 248-750-0270
Fax: 248-936-2105
gmisovski@romanolawpllc.com
http://www.danielromanolaw.com/

Stanley Jackson

Date: May 14, 2013

Pursuant to Federal Rule of Civil Procedure 26, I have studied the reports and other material provided to me regarding this case.  Please be advised that as further information is provided in this case, it is possible that a supplementary report will be necessary.  I will also supplement this report if I am asked to comment upon any defense witness opinions.

## My Qualifications for Reviewing this Case:

I have been a Deputy Sheriff for almost 30 years. I joined the Los Angeles County Sheriff's Department on January 21, 1977.  I retired August 14, 2006.  I was assigned to the Special Enforcement Bureau for over 20 years, working as a canine handler, canine unit trainer, Taser instructor, and assisted on S.W.A.T. calls.  I have trained hundreds of police dog handlers and their canines in all aspects of canine handling. I have trained canine teams from all over the United States.  I have also trained The United States Marine Corps regarding the use of canines in

1

S.W.A.T. type calls.  I selected many police canines used by the Los Angeles County Sheriff's Department. I am a California POST certified canine evaluator, and have tested many agencies canine teams and qualified or disqualified them for service.  I hold a California Peace Officer Standards and Training (POST) Advanced Certificate.  I was the canine unit statistician for 15 years.  I prepared the statistics for 12 canine units' activity and reported the information through the chain of command to the Sheriff.

I wrote articles to the Sheriff's Department focusing on the need for several supervisors for the canine unit, training equipment, and outside the unit training, to lower bite ratios.  Bite ratios dropped from 80 percent to less than 30 percent. I developed the canine statistical computer program, reporting form, and data record management for the Los Angeles County Sheriff's Department.

I was a Taser instructor for several years, authorized by Taser International in the use of the M26 Taser.  During my assignment at The Special Enforcement Bureau, I taught approximately 45 deputies and 6 sergeants regarding the use of the Taser. I taught several supervisors how to download the data from the Taser. I was in charge of managing the Tasers for the canine unit which included Taser downloads and clock management. I was taught by Taser regarding the procedures for downloading Taser information from the M26 Taser. I have been tased and I have tased individuals in training and during my field assignments.

I assisted training attorneys from several firms representing the County of Los Angeles regarding the use and misuse of canine in all aspects of police functions.

I was a trainer for the non-profit organization Dogs against Drugs Dogs against Crime.  I trained hundreds of canine teams regarding the use of canine in SWAT operations, including the United States Marine Corps.

**Synopsis According to Deputies:**

Surveillance was being conducted by officers of the Livingston and Washtenaw Narcotics enforcement Team (LAWNET) and observed what appeared to be a hand-to-hand narcotics transaction. A traffic stop was made by WCSD Deputy Chad Teets on Regervin Brown. Brown was had just been observed in a suspected drug transaction which led to the recovery of marijuana and several Vicodin pills that Brown later stated had been purchased from Mr. Stanley Jackson.

Deputy Urban and Deputy Mercure stopped their patrol cars near the driveway at 8707 Heather Dr., Ypsilanti; MI. Deputy Urban started to approach Stanley Jackson to detain him for a narcotics investigation.  At the same time, Deputy Mercure detained the male who was with Stanley Jackson, until a detective relieved him so he could help Deputy Urban.

Stanley Jackson turned toward the open attached garage and began running. Stanley Jackson ran toward the interior garage door that enters the residence. He was holding his waist band. Deputy Mercure gave several loud verbal commands for Jackson to "STOP" and further advised that he would be Tased. Stanley Jackson continued into the residence holding his waist band.

Jackson attempted to shut the door as Deputy Urban continued after Jackson in hot pursuit. Deputy Urban states he was in close proximity to Jackson, and Jackson continued through the kitchen toward the living room. Jackson was screaming unrecognizable statements as he faced away from Deputy Urban. Jackson still had his hands near his waist band. Deputy Urban continued giving Jackson verbal commands to "Stop".

Jackson stopped near the living room and attempted to turn towards Deputy Urban. As Jackson turned toward Deputy Urban, Deputy Urban feared that Jackson may have brandished a deadly weapon from his waist band. Deputy Urban discharged the Taser at Stanley Jackson. Jackson fell to the kitchen floor. Deputy Urban continued verbal commands to Jackson.

Deputy Urban grabbed hold of Jackson's arm as he lay on his side screaming. Jackson continued to hold his arms tight near the front of his body as he received the effects of the Taser deployment.

Deputy Mercure entered the residence in attempt to provide assistance. Deputy Urban continued to gain control of Jackson's right arm as his body still felt tense from the Taser device. As Jackson's muscles began to un-tense, Deputy Mercure was able to place a handcuff on the right hand. Deputy Mercure advised dispatch that the Taser had been deployed and requested for HVA.

Jackson began spitting up and making unrecognizable statements as he stared straight ahead without eye movement. Deputy Mercure held the handcuff attached to the right arm while Deputy Urban began to handcuff Jackson's left wrist.

While continuing to apply handcuffs, Jackson' physically started to pull away as he attempted to get off the kitchen floor. Deputy Mercure and Deputy Urban held each arm and continued using muscling techniques to hold Jackson to the floor.

Jackson continued physically resisting Deputy Mercure and Deputy Urban as they continued to muscle Jackson's arms away from his body in attempt to successfully handcuff Jackson.  Jackson was "Drive Stunned" by Deputy Mercure. Deputy Reich and Deputy Farmer entered the residence to provide assistance.

Deputy Mercure and Deputy Urban attempted to muscle Jackson's left arm behind his back. Deputy Farmer attempted to take control of Jackson's right arm, while Deputy Reich controlled Jackson's legs to reduce movement. After unsuccessfully gaining control, Deputy Urban applied a "Drive Stun" to Jackson's mid-back section. The Taser appeared to have no effect on Jackson. Deputy Mercure and Deputy Urban successfully attached the left handcuff to the rear of Jackson's belt. Once secure, the right arm was then secured behind his back after struggling with his violent movements.

Stanley Hugh Jackson M/B, 02-24-1979, died at St. Joseph Mercy Hospital on Friday August 20, 2010. Prior to his death, Stanley Jackson was arrested by Deputies from the Washtenaw County Sheriff's Office. During the arrest Stanley Jackson was Tased several times.

## **Material studied to render my opinion:**

POST Training Domain # 1: - "History, Professionalism, and Ethics."

POST Training Domain # 2:- "Criminal Justice System."

POST Training Domain # 20: – "Use of Force."

POST Training Domain # 21: – "Patrol Techniques."

POST Training Domain # 33: – "Arrest Methods/Defensive Tactics."

International Association of Chiefs of Police model Taser Policy and Concepts

M26 and X26 Tasers for trial demonstration

Taser training target

Taser training versions 2-18

Taser Attorney Michael Brave's web site and training information, Michael A. Brave, Esq., M.S., C.P.S., C.S.T., President, LAAW International, Inc.

IADELEST

Police reports 5966.1

Autopsy WME-10 -588

Photographs of Stanley Jackson

Photograph of Taser probe

MCOLES

Taser Download data

**Opinions:**

- **The evidence in this incident is extremely disturbing. I have accounted for three Taser probes and found no evidence of drive stun on Mr. Jackson's person. I have accounted for three probes and a total of four punctures. The police reports do not support my findings.**
- Stanley Jackson was Tased in probe mode by two Tasers at or around the same time. See Taser Data Download Printout, the autopsy, and photographs.
- Stanley Jackson received a lengthy Taser deployment that far exceeds Taser recommendations, the recommendations by the International Association of Chiefs of Police, and The Department of Justice CED guidelines.
- The Sheriff's Department failed to collect the AIDS from the Taser Deployments which was in place for identifying who used the Taser, and how many Tasers were deployed in probe mode. Confetti Tags(AFIDS) are Confetti-like tags expelled from a cartridge of the Taser when fired. Each tag contains a serial number unique to the specific cartridge used.
- If Mr. Jackson was wearing his hat when the Taser was deployed, he certainly received the activation to the head and brain. Taser teaches not to target that area. Evidence suggests a head deployment due to a probe being observed by the officers in Stanley Jackson's hat.

*On October 12, 2009, TASER International released Training Bulletin 15.0 entitled Medical Research Update and Revised Warnings. The Bulletin included an update on the results of several medical research projects, the newest product warnings, and the new preferred target zones for TASER Electronic Control Devices (ECDs). The preferred target zones are lower center of mass (below the chest) for the front of the body, and below the neck for the back.*

- The autopsy report, police reports, and hospital reports support there were multiple Taser activation used on Stanley Jackson in probe mode for an excessive amount of time.  See below statements.
- The Deputies reports do not support the fact that there are probe placements to the front and back of Stanley Jackson.  The deputies state only one probe activation and possibly three drive stun activations were applied to Mr. Jackson.  I believe the activations were all in probe mode which caused complete incapacitation for a long period of time as evidenced by the deputy's statements regarding Stanley Jackson's behavior with muscle contractions.  See police reports.
- The deputies perceived Mr. Jackson to be combative and resistive during the arrest.  **Mr. Jackson was struggling for his life, not against the deputies**. It is a known fact that a person being Tased cannot breathe properly.  With prolonged Taser applications, the person being Tased thrashes around from pain and the inability to breath. The deputies failed to recognize the symptoms Mr. Jackson was displaying.
- The Sheriff's Department should have secured the scene, called homicide, and photographed the entire area prior to being disturbed and collected evidence.
- The Sheriff's Department failed to adequately train their deputies regarding the use of the Taser, and make available all known information regarding the Taser and injuries caused during activations.  They should not rely solely on the manufacturer training information.  Numerous other law enforcement agencies have had similar situations.  It is imperative each agency conduct research and modify the training for the usage of the Taser.
- The deputies failed to write accurate police reports regarding this incident. I found nothing written by the deputies that would account for the front and rear probe injuries.
- Internal Affairs should have found the very same facts that I have found and conducted an investigation as to why there are more than two probe entries on Mr. Jackson's body, and three Taser probe darts.

***Abdomen:***
Present over the right lateral inferior abdomen are two (2), 0.1 cm identifiable abrasions with an associated 0.5 cm abrasion. This is suggestive for electromechanical disruptive device dart perforations.

***Back and sacrum:***
Overlying the right back at the level of the distal scapula is a superficial 0.1 cm abrasion suggestive of a burned area. 3.5 cm cephalad and medial are two additional 0.1 cm burn-like abrasions. These are separated from distance of 2.2 cm and again 3.0 cm cephalad two associated abrasions measuring 3.0 cm in distance. There are suggestive of electromechanical disruptive device punctures.

Medical professionals already removed one dart from an unknown location on Jackson's body. Taser #1

The second dart was removed from Jackson's hat. Taser Probe #2

***Medical decision making:***
Course in the emergency department: the patient presented and was extremely agitated. When I walked in the room he was on his back and yelling. His hands were in cuffs behind him and restraints tied to the bed. He was given 2 mg IM Ativan for sedation. He calmed down within about 1-2 minutes and they took the handcuffs off of the patient while in the seated upright position. We removed a Taser lead found in his back. Taser Probe #3 is pictured below.



- The Sheriff's Department failed to maintain and supervise the Taser devices as evidenced by the incorrect dates and times of the Taser download information.
- Deputies are not trained properly to understand the effects of the Taser. During a Taser application, the body becomes rigid and the person being Tased is not in control of his own person any longer.  Officers are confusing that behavior as resistive and not responding to the officers commands. The inability for the person to follow orders causes the officers to apply additional force.

**Conducted Energy Device (CED)**

A weapon primarily designed to disrupt a subject's central nervous system by means of deploying electrical energy sufficient to cause uncontrolled muscle contractions and override an individual's voluntary motor responses

**Description of the Taser:**

Electro-muscular disruption technology, as a tool used by peace officers to employ force, is unique from other weapons and techniques, and subject to specialized considerations concerning its proper use.  Depending on its method of use, the Taser has the capacity to overcome the central nervous system, meaning that it can cause the human body to become rigid and inflexible due to the electricity running through it.  However, when used in "drive-stun" or "contact Tase" mode, the Taser operates mainly as a pain compliance tool that does not incapacitate individuals in the same way as a Taser used in "dart mode."  Pulling and releasing the trigger on a Taser will initiate one 5 second cycle of approximately 50,000 volts at very low amps.  There is no mechanism on the device prohibiting an officer from pulling and releasing it continuously, which would release continuous cycles of voltage into the subjects' body.  In drive stun mode the Taser is much more painful and causes the skin to burn and become scarred.  The person being Tased will react in a variety of different ways, and officers need to know what the person being Tased reactions will or could be.  The reason is that this will help the officer to recognize that the suspect is not of his own control, and he is not resisting when the officer is giving the suspect commands and he won't comply.  Properly trained officers will know that the person being Tased is not trying to kick or hit them on purpose, but is a reaction to being Tased due to the extreme amount of pain.

**Effects of ECWs:**
The effects of ECWs are well documented but vary somewhat depending on the subject and the circumstances. The following are typical examples of subject reactions to the electrical charge:
•Falling immediately to the ground and injuries received as a result from falling.
•"Freezing" in place (involuntary muscle contractions) during the discharge of current, kicking.
•Yelling, screaming, or being silent
•Feeling dazed for several seconds or minutes
•Temporary tingling sensation
•Lack of any memory or sensation of pain
•Slight signature marks that resemble surface burns on the skin that may appear as red marks or blisters

•Eye injury from probe contact
•Secondary injuries caused by falling
Given the above listed effects caused by the Taser, a person being Tased will give officers the perception of a non-compliant suspect.  For additional information see the training videos produced by Taser international.

**PERF CED Guidelines for Consideration**

These 52 CED guidelines for consideration are presented with the understanding that many use-of-force situations can change rapidly and may require law enforcement officers to make quick decisions about force options. It is impossible to anticipate every possible use of force situation or circumstance that may occur and, in all cases; officers need to rely on their training, judgment, and instincts. The considerations noted below, however, can help law enforcement officers make more informed judgments about CEDs and how and when to use CEDs to protect themselves and the public.

While every effort was made to consider the views of all contributors and the best thinking on the vast amount of information received, the resulting PERF guidelines do not necessarily reflect the individual views of every stakeholder involved in the development process, or the views of the U.S. Department of Justice.

1. CEDs should only be used against persons who are actively resisting or exhibiting active aggression, or to prevent individuals from harming themselves or others. CEDs should not be used against a passive suspect.
2. No more than one officer at a time should activate a CED against a person.
3. When activating a CED, law enforcement officers should use it for one standard cycle and stop to evaluate the situation (a standard cycle is five seconds). If subsequent cycles are necessary, agency policy should restrict the number and duration of those cycles to the minimum activations necessary to place the subject in custody.

4. Training protocols should emphasize that multiple activations and continuous cycling of a CED appear to increase the risk of death or serious injury and should be avoided where practical.

5. Training should include recognizing the limitations of CED activation and being prepared to transition to other force options as needed.

Conducted Energy Devices: Development of Standards for Consistency and Guidance. The Creation of National CED Policy and Training Guidelines:

6. That a subject is fleeing should not be the sole justification for police use of a CED. Severity of offense and other circumstances should be considered before officers' use of a CED on the fleeing subject.

7. CEDs should not generally be used against pregnant women, elderly persons, young children, and visibly frail persons unless exigent circumstances exist.

8. CEDs should not be used on handcuffed persons unless they are actively resisting or exhibiting active aggression, and/or to prevent individuals from harming themselves or others.

9. CEDs should not generally be used when a subject is in a location where a fall may cause substantial injury or death.

10. When a subject is armed with a CED and attacks or threatens to attack a police officer, the officer may defend himself or herself to avoid becoming incapacitated and risking the possibility that the subject could gain control of the officer's firearm. When possible, officers should attempt to move outside the device's range (approximately 21 feet) and seek cover, as well as request backup officers to mitigate the danger.

11. When possible, emergency medical personnel should be notified when officers respond to calls for service in which it is anticipated that a CED may be activated against a person.

12. Officers should avoid firing darts at a subject's head, neck, and genitalia.

13. All persons who have been exposed to CED activations should receive a medical evaluation. Agencies shall consult with local medical personnel to develop appropriate police-medical protocols.

14. All persons who have been subjected to CED activations should be monitored regularly while in police custody, even if they received medical care.

15. CED darts should be treated as a biohazard. Officers should not generally remove CED darts from a subject that have penetrated the skin unless they have been trained to do so. Agencies should coordinate with medical personnel to develop training for such removal. Only medical personnel should remove darts that have penetrated a person's sensitive areas.

16. Following CED activations, officers should use a restraint technique that does not impair respiration.

17. CEDs should not be used in the known presence of combustible vapors and liquids or other flammable substances including but not limited to alcohol-based Oleoresin Capsicum (O.C.) Spray carriers. Agencies utilizing both CEDs and O.C. Spray should use a water-based spray.

18. Agencies should create stand-alone policies and training curriculum for CEDs and all less-lethal weapons, and ensure that they are integrated with the department's overall use-of-force policy.

19. Agencies should partner with adjacent jurisdictions and enter into a Memorandum of Understanding to develop joint CED policies and protocols. This should include addressing nonalcoholic O.C. Spray carriers. Agencies should also establish multijurisdictional CED training, collaboration, and policy.

20. If officers' privately owned CEDs are permitted to be used on duty, policy should dictate specifications, regulations, qualifications, etc. The devices should be registered with the department.

21. The CED "Probe Mode" should be the primary setting option, with "Drive Stun Mode" generally used as a secondary option.

22. CEDs should be regulated while officers are off duty under rules similar to service firearms (including storage, transportation, use, etc.).

23. CEDs should not be used against suspects in physical control of

a vehicle in motion including automobiles, trucks, motorcycles, ATVs, bicycles, and scooters unless exigent circumstances exist.

24. The use of brightly colored CEDs (e.g., yellow) reduces the risk of escalating a force situation because they are plainly visible and thus decrease the possibility that a secondary unit mistakes the CED for a firearm (sympathetic fire). Note that specialized units (e.g., SWAT Units) may want dark-colored CEDs for tactical concealment purposes.

25. CEDs should be maintained in a holster on an officer's weak (support) side to avoid the accidental drawing and/or firing of an officer's sidearm.

26. Officers should be trained that the TASER™ CED's optimum range is 15 feet.

27. Auxiliary/Reserve officers can be armed with CEDs provided they receive all mandated training and maintain all requalification requirements. Training and local statutes may dictate policy.

28. A warning should be given to a person prior to activating the CED unless to do so would place any other person at risk.
29. When applicable, an announcement should be made to other officers on the scene that a CED is going to be activated.

30. A supervisor should respond to all incident scenes where a CED was activated.

31. A supervisor should conduct an initial review of a CED activation.

32. Every instance of CED use, including an accidental discharge, should be accounted for in a use-of-force report.

33. Agencies should consider initiating force investigations outside the chain of command when any of the following factors are involved:
a. A subject experiences death or serious injury.
b. A person experiences prolonged CED activation.
c. The CED appears to have been used in a punitive or abusive manner.

d. There appears to be a substantial deviation from training.
e. A person in an at-risk category has been subjected to
activation (e.g., young children; persons who are elderly/frail,
pregnant women, and any other activation as determined by a
supervisor).

34. When possible, supervisors and backup officers should anticipate on-
scene officers' use of CEDs by responding to calls for service that have a
high propensity for arrest and/or use of a CED.
Conducted Energy Devices: Development of Standards for Consistency and
Guidance The Creation of National CED Policy and Training Guidelines
Association of Chief Police Officers, 2004. Independent Evaluation of the
Operational Trial of TASER.™

35. Every substantial investigation (and when possible every preliminary
investigation) should include:
a. Location and interview of witnesses (including other officers).
b. Photographs of subject and officer injuries.
c. Photographs of cartridges/darts.
d. Collection of CED cartridges, darts/prongs, data downloads, car video,
confetti ID tags.
e. Copies of the device data download.
f. Other information as indicated in guideline #45.

36. Police leaders should be aware that CED download data may be
unreliable. Police leaders and investigators should be able to articulate the
difference between the actual duration of a CED activation on a person and
the total time of discharge registered on
a CED device.

37. CED activations should be tracked in the department's early intervention
system (EIS).

38. The department should periodically conduct random audits of CED data
downloads and reconcile use-of-force reports with recorded activations.
Departments should take necessary action as appropriate when
inconsistencies are detected.

39. Audits should be conducted to ensure that all officers who carry
CEDs have attended initial and recertification training.

40. Departments should not solely rely on training curriculum provided by a CED manufacturer. Agencies should ensure that manufacturers' training does not contradict their use-of-force policies and values. Agencies should ensure that their CED curriculum is integrated into their overall use-of-force systems.

41. CED recertification should occur at least annually and consist of physical competency and device retention, changes in agency policy, technology changes, and reviews of local and national trends in CED use.

42. Exposure to CED activation in training should be voluntary; all officers agreeing to be subjected to a CED activation should be apprised of risks associated with exposure to a CED activation.

43. Supervisors and command staff should receive CED awareness training so they can make educated decisions about the administrative investigations they review.

44. Statistics should be maintained to identify CED trends and deployment concerns. Agencies may include display and arcing of weapons to measure prevention/deterrence effectiveness. CED statistics should be constantly analyzed and made publicly available.

45. The following statistical information should be included when collecting information about CED use:
a. Date, time, location of incident.
b. The use of the laser dot or display of the CED that deterred a subject and gained compliance.
c. Identifying and descriptive information of the suspect (including membership in an at-risk population), all officers firing CEDs, all officer witnesses, and all other witnesses.
d. The type and brand of CED used.
e. The number of CED cycles, the duration of each cycle, the duration between cycles and the duration that the subject was actually activated.
f. Level of aggression encountered.
g. Any weapons possessed by the suspect.
h. The type of crime/incident the subject was involved in.
i. Determination of whether deadly force would have been

justified.

j. The type of clothing worn by the subject.

k. The range at which the CED was used.

l. The type of mode used (probe or drive stun).

m. The point of impact of probes on a subject in probe mode.

n. The point of impact on a subject in drive stun mode.

o. Location of missed probe(s).

p. Terrain and weather conditions during CED use.

q. Lighting conditions.

r. The type of cartridge used.

s. Officer suspicion that subject was under the influence of drugs (specify if available).

t. Medical care provided to the subject.

u. Any injuries incurred by an officer or subject.

46. Law enforcement agencies should conduct neighborhood programs that focus on CED awareness training. CED training should be part of any citizen's training academy program.

47. The agency's Public Information Officer should receive extensive training on CEDs in order to better inform the media and the public about the devices. Members of the media should be briefed on the department's policies and use of CEDs.

48. CED awareness should extend to law enforcement partners such as local medical personnel, citizen review boards, medical examiners, mental health professionals, judges, and local prosecutors.

49. CEDs can be effective against aggressive animals. Policies should indicate whether use against animals is permitted.

50. Officers should be aware that there is a higher risk of sudden death in people under the influence of drugs and/or symptoms associated with excited delirium.

51. CED cartridges with longer barbs may be more effective in extremely cold climates.

52. Agencies should be aware that CED cartridges have experienced firing problems in extremely cold weather.

**POLICE/CANINE/TASER/SWAT**

I Joined the Los Angeles County Sheriff's Department in January 21, 1977 and retired August 14, 2006.  After the academy I was assigned to Wayside Honor

Ranch where I supervised inmates in maximum and minimum security, and supervise an inmate work crew taking care of the animals at the ranch.  My next assignment was one which was not voluntary, and I was assigned to headquarters narcotics as an undercover buyer posing as a student at Pepperdine University in Malibu.

I returned to working the jails at Men's Central Jail in downtown Los Angeles, supervising inmates in a maximum security facility.  My next assignment would be one of the toughest assignments on the Sheriff's Department.  I was assigned to Lynwood as a patrol trainee.  The area covered a large portion of South Central Los Angeles.  I worked many different assignments at Lynwood Station such as jailer, watch deputy, traffic deputy, training officer, auto theft detective, and burglary detective.

I transferred several years later to Santa Clarita where I was a training officer.  An unusual position came available which I transferred to.  The position was in a rural area in the north end of Los Angeles County. The small town of Gorman had two resident deputies which had an area of over 350 square miles of area to patrol.  The nearest back up was about an hour away.  Interstate 5 is the main highway through California for travelers heading north.  This assignment included a canine partner since the resident deputy works alone and all different hours.

After working Gorman with a canine, I transferred to the Special Enforcement Bureau, Canine Detail.  My duties consisted of high risk felony suspect searches, armed misdemeanor suspect searches, article searches, SWAT calls, and training. While working as a canine handler, Aero Bureau asked me to assist them with a personnel shortage, knowing that I was a commercial helicopter pilot.  I was transferred to Aero Bureau for one year.  I returned to the canine unit which was decentralized for about one year and returned the Special Enforcement Bureau.  I have been assigned to that position since.

I have detained and arrested thousands of people during my 30 year career.  I have handcuffed most of those individuals using techniques taught by the Los Angeles County Sheriff's Department and other agencies whose training I have attended.

**Assignments**

| | |
|---|---|
| 01/1977 | 16 week academy, class 183 |
| 5/1977 | Wayside Honor Ranch, Minimum Security, Main Central Jail |
| 5/1978 | Headquarters Narcotics Division, undercover buyer |
| 6/1979 | Lynwood Station, Patrol, Field Training Officer, Auto Theft Investigator, Burglary Detective. |
| 4/1983 | Santa Clarita Station, Field Training Officer |
| 1/1984 | Gorman Sheriff's Station, Canine handler, 350 Sq. mile rural area. |
| 1/1986 | Santa Clarita Station Canine handler |
| 1/1987 | Special Enforcement Bureau, Canine handler and assist SWAT |
| 4/1988 | Aero Bureau, Observer and Pilot, certified in reciprocating and turbine helicopters, commercial helicopter pilot. |
| 1/1989 | Lennox Sheriff's Station, Canine handler and assist SWAT |
| 1/1990 | Special Enforcement Bureau, Canine handler, Trainer, and assist on SWAT calls and warrant services |

Patrol Training

| | |
|---|---|
| 1/1984 | AR-15 training |
| 1/1985 | Off road vehicle driving |
| 9/1989 | Tactical communication |
| 6/1991 | Special Enforcement Bureau weapons training |

| | |
|---|---|
| 4/1993 | Benelli Automatic shotgun training |
| 3/1991 | Handling mentally ill persons |
| 4/1994 | Chemical agents |
| 4/1994 | Arwin training |
| 4/1994 | Sting ball training |
| 4/1994 | Diversionary device training |
| 4/1994 | Taser training |
| 5/1993 | Special Enforcement Bureau weapons training |
| 7/1993 | Special Enforcement Bureau weapons training |
| 9/1996 | Code 3 driving |
| 9/1996 | Sexual harassment training |
| 1/1998 | Oleoresin Capsicum training |
| 5/2000 | Vehicle pursuits and tactics |
| 6/2001 | Taser instructor training, Instructor Certification # 010626138631412871346C |
| 2/2003 | MP-5 training |
| 12/2003 | Medical services training |

## Canine Training and Education

| | |
|---|---|
| 5/1984 | Los Angeles County Sheriff's Department basic canine training class, 160 hrs. |
| 4/1985 | Canine seminar at San Simeon, Ca. 3 days |

| | |
|---|---|
| 1/1987 | Adlerhorst Police Canine Handler School, 160 hrs |
| 1/1988 | Los Angeles County Sheriff's SWAT school |
| 2/1989 | Los Angeles County Sheriff's Department canine training course, 6 weeks |
| 8/1989 | Los Angeles County Sheriff's Department canine training course, 4 weeks |
| 3/1990 | Long Beach Police Department Canine Training Course, 48 hrs |
| 8/1990 | Adlerhorst International POST recertification |
| 6/1991 | Canine Special Weapons Team School #1 |
| 11/1991 | California and Swiss search dog association disaster training, 1ST Phase |
| 2/1992 | California and Swiss search dog association disaster training, 2nd Phase |
| 4/1992 | California and Swiss search dog association disaster training, 3rd Phase |
| 6/1993 | Adlerhorst International legal update |
| 9/1993 | Adlerhorst PSD Legal Seminar |
| 9/1995 | Orange County Sheriff's Department Canine Handler Development |
| 10/1995 | Adlerhorst Police Dog Handler School 160 hrs |
| 11/1997 | POST K9 Team Evaluator's Course #3500-24040-97001 |
| 3/2003 | Adlerhorst Agitator School |
| 3/2003 | Adlerhorst Handler Development School, 40 hrs |
| 3/2003 | Adlerhorst Police Dog Handler School, 200 hrs |

**California POST Certified Canine Evaluator**

1991 to          POST certify approximately 75 canine teams for service

Present

**Canine Training Lectures Received**

1985   Palmdale Canine Training and Kennels, Bob McAdams

1986   Golden West Canine, Fred McNabb

1986   Alabama Kennels, Ted Sexton

1987   Adlerhorst International, David Reaver

1991   Bakersfield Kennels, Tony Barrios

1993   Adlerhorst International legal update, David Reaver

**Los Angeles County Sheriff's Department Canine Trainer/Instructor**

1989 to 2003          Trained Sheriff's Deputies newly assigned to the canine unit to
perform all functions as a canine handler, and to work in
conjunction with SWAT and Aero Bureau.  This included
public lectures, demonstrations, and briefings.

**Competitions**

1993             Competed in the 1993 Police and Fire Summer Games in Los
                 Angeles Ca.


**Competitions Judged**


Judged the SWAT/K9 competitions in Utah


**Canine Demonstrations Conducted in Los Angeles County**


150 Schools

200 LASD station demos

25   CHP and P.D. demos

50   Demos for Rotary clubs, Women's clubs, Boys and Girl
Scout clubs, and handicapped schools


**A Few of the Police Departments/Law Enforcement Agencies in California I
Have Trained regarding police service canines.**


Monterey Park P.D.

Inglewood P.D.

San Diego S.D

Shasta County S.D.

Ontario P.D.

Culver City P.D

L.A.P.D.

Ventura S.S and P.D.

Long Beach P.D.

Hawthorne P.D.

Fresno P.D.

El Monte P.D.

Burbank P.D.

Montebello P.D.

Railroad P.D.

San Fernando P.D.

Monrovia P.D.


**Canine Searches Conducted**


1984 to 2004

4000 area and building searches

50 missing person searches

10 dead body searches

500 SWAT calls

100 warrant services

1000 apprehensions


**Studied**

United States Police Canine Association

Survey of Southern Police Departments using canines and the use of force

Bite ratios from various law enforcement agencies throughout the United States

Find ratios from various law enforcement agencies throughout the United States

Persons killed by canines, Robinette vs. Tennessee

California Peace Officers Standards and Training

Bark and guard theory

Find and bite theory

Ways to compile canine statistics


**Reading materials**


Glen R. Johnson, Book of Tracking

Scent, Milo D. Pearsall

Police Product News

Training, The Manual, Cornel Conrad Most


**Commendations**


Over 100 felony suspect search commendations for tactics

Over 25 commendations for canine demonstrations and lectures

25 citizen's commendations for assisting those involving things as teenage attempted suicide prevention, lost children, controlled use of force, and such related police evolvement.

50 various law enforcement related commendations for tactics

Bi monthly and weekly scheduled canine training hours

5000 hours

Daily training

2 hours per shift, 4 shifts per week, for over 20 years

**Collateral duties**

Taser instructor

Canine instructor/trainer

Maintain computer input of canine statistics

Canine POST evaluator

Maintain weapons training with SWAT

Generate monthly report to the Sheriff regarding all canine activity

Train newly assigned supervisors to canine unit

Instruct use of force to canine handlers and station deputies, 9000 man department

**Articles written to the Los Angeles County Sheriff's Department**

Reprogramming the radio

Find and bite vs. find and bark

In house training articles

The canine training manual

Working canines in SWAT lecture

**Canine Vehicles**

Installed and wired the canine vehicles so audio prerecorded canine announcements could be played from a cassette over the public address system in Spanish and English.  This allowed suspects to surrender and residents to go in their homes for safety.

**Super Sock Bean Bag**

Conducted test firings of the CTS Super- Sock 12 gauge projectile at various distances.  The tests were recorded using high speed photography.  I assisted the Los Angeles County Sheriff's Department Training Bureau testing the bean bag and 37 mm Arwin by receiving shots.

Very truly yours,

Ernest Burwell

Ernest Burwell
Police Consulting
P.O. Box 2083
Thompson Falls, Montana 59873

406-531-9223
ewbk94@gmail.com

The following is a list of current cases I have testified on, or offered my opinions on, either in Superior, State, or Federal Court.

ARELLANES V ALBUQUERQUE CIV0900432BBRHS Attorney Zac Ives
ALBUQUERQUE NEW MEXICO

ATHETIS V ALBUQUERQUE 09CV00677PHXNVW Attorney Richard Treon
ALBUQUERQUE NEW MEXICO

BAIRD V KING COUNTY WA. 210CV01540JLK

BLAKE DUPREE  V LOS ANGELES COUNTY SHERIFF'S DEPARTMENT Attorney Justin Sanders
LOS ANGELES CA. CV091110

BLONDIN V SNOHOMISH C091487RSL Attorney Joseph Shaeffer
SNOHOMISH WA.

BOBO V CITY OF STOCKTON 209CV00753WBSGGH Attorney Steven Yourke
STOCKTON CA.

CLEMENT V CITY OF EAST CHICAGO POLICE DEPARTMENT 207CV35 Attorney Mike Polen
EAST CHICAGO IN.

DAVIS V KOOTENAI COUNTY SHERIFF'S DEPARTMENT, ID. CIV05280NEJL Attorney Larry Kuznets
KOOTENAI  ID.

ENGLAND V LAS VEGAS METRO POLICE DEPARTMENT 207CV01238PMPGWF Attorney Cal Potter
LOS VEGAS NV.

ENGMAN V ONTARIO CA. EDC100000284CASFFM Attorney Peter Shluter

EWING V  LOS ANGELES POLICE DEPARTMENT No. CV 07-5556-GHK (JWJx)Attorney James DeSimone
LOS ANGELES CA.

FLANNAGAN V GARDENA POLICE DEPARTMENT CV065600PSG
Attorney Paul Hoffman
LOS ANGELES CA.


FOLLINI V CITY OF NEWBURG NEW YORK 08CIV6347 Attorney
David Klein

GAINES V TEMPE ARIZONA Attorney Scott Halverson

GONZALES V FRESNO CA. POLICE DEPARTMENT
CIVF046371OWWSMS Attorney Weisberg
FRESNO CA.

GUERRERO NEMECHEK V GARDEN CITY POLICE DEPARTMENT
Attorney Boone
GARDEN CITY KANSAS

HESTON V SAN JOSE POLICE DEPARTMENT 505CV3658 Attorney
John Burton,  Peter Williamson
SAN JOSE CA.

HUNSUCKER V TIPPAH COUNTY MISSISSIPPI Attorney Charles
Mullins

JARVIS PAYNE V CITY OF CHICAGO 05L7032 Attorney Jason Gatzulis
CHICAGO IL.

KIM V SANTA CLARA C0900025RS  Attorney Brian Gearinger
SANTA CLARA CA.

KIRBY V SANTA BARBARA COUNTY SHERIFF'S DEPARTMENT
CRIMINAL TRIAL Attorney David St. John
SANTA BARBARA CA.

LAL V STATE OF CALIFORNIA C065158PHJ Attorney Sydney Fairbairn

LAMBERT V CITY OF LOS ANGELES Attorney Lindsey Battles

LEE V NASHVILLE POLICE DEPARTMENT Case 306108 Attorney Joe
Bednarz Jr.
NASHVILLE TN.

MARQUEZ V PHOENIX POLICE DEPARTMENT 208CV1132 Attorney
Lynn Schumway
PHOENIX AR.

MAYFIELD V CITY OF LONG BEACH CA. CV0905773VBK Attorney
Carol Sobel

MCDONALD V NORCOR JAIL FACILITY THE DALLES OR.  CV09416
Attorney Lynn Walsh
THE DALLES OR.

MILLER V GREENVILLE SOUTH CAROLINA Attorney William Ehlies

MILLS V HAMDEN POLICE DEPARTMENT 307CV01684CFD Attorney
Jonathan Einhorn
HAMDEN CT.

MOLINA V CITY OF ALHAMBRA CV0602295DDP Attorney Todd
Krauss
ALHAMBRA CA.

MOMENI V ORANGE COUNTY CA. 06CC12033 Attorney Gary
Cassleman

MORRISON V MUSKINGUM COUNTY SHERIFF'S DEPARTMENT
C206CV283 Attorney Michael Rourke
ZANESVILLE OH.

NELSON V ALBUQUERQUE 10553BB/DJS Attorney Justin
Pizzonia/Sharon Hawk
ALBUQUERQUE NM.

NELSON V LONG BEACH CA. Attorney Amash

NEIDENGER V COUNTY OF PIERCE WA. C105702RBL Attorney
Christopher Taylor

ONTIVEROS ROSENBERG POLICE DEPARTMENT 406CV03293
Attorney Jorge Borunda
ROSENBERG TX.

OVERTON V MARION COUNTY SHERIFF'S DEPARTMENT
106CV1513 Attorney Richard Waples
INDIANAPOLIS IN.

PARKS V DAVIS POLICE DEPARTMENT CITATION 125352 Attorney
Michael Jones
DAVIS CA.

PHILLIP V FRESNO POLICE DEPARTMENT CIV-F-04-6729-AWI TAG
Attorney Jacob Weisberg
FRESNO CA.

PIERCE V CITY OF SALEM, OR. CV061715ST Attorney David Park
SALEM OR.

RAYBOULD V ROSEVILLE POLICE DEPARTMENT SC# 62045322
Attorney Michael Jones
ROSEVILLE CA.

SOLIS V BREWSTER CV08021EFS  Attorney Janet Rice
BREWSTER WA.

TUCKER V LAS VEGAS METROPOLITAN POLICE DEPARTMENT
Attorney John Funk
LAS VEGAS NV.

VILLANUEVA V CITY OF FONTANA CA. ED09SG0CV1536 Attorney
Jorge Gonzales

WALKER V LAS VEGAS METROPOLITAN POLICE DEPARTMENT
Attorney Nadia von Magdenko

LAS VEGAS NV.

WILLIAMS V CLEVELAND MISSISSIPPI CV00215SADAS Attorney
Ronald Stutsman


JEFFERY WOODWARD, deceased, and SANDRA RUTTER, Plaintiffs v
CITY OF
GALLATIN, TENNESSEE, GALLATIN POLICE DEPARTMENT, JOHN
DOES 1–10, and TASER INTERNATIONAL, INC. No. 3:10-cv-01060
Attorney Joe Bednarz Jr.

Ernest Burwell
**Police Consulting**
**P.O. Box 2083**
**Thompson Falls, Montana 59873**
406-531-9223

ewbk94@gmail.com

My Fee Schedule is as follows:

Travel expenses as actually incurred, such as: lodging, reasonable meals, and flight/driving costs. Reimbursement may be required for loss of pay due to closing my business for this service. ll case review, consulting, and writing of expert opinions (such as Rule 26 reports) at $300.00 per hour.

All testimony (either at trial or deposition) at $300.00 per hour, with a four hour minimum required.

A Non Refundable Retainer Fee of $3000.00 when initially retained which is used against the above listed fees.  Subsequent billings at the rates specified.

There is no formal contract required.  My Federal Tax ID Number is **20-4546542**

Very truly yours,

Ernest Burwell