# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Deborah S. Hunt
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: January 31, 2017

Mr. David G. Blake
Romano Law
26555 Evergreen Road
Suite 1500
Southfield, MI 48076

Mr. Keith E. Eastland
Miller Johnson
45 Ottawa Avenue, S.W.
Suite 1100
Grand Rapids, MI 49503

Ms. Cynthia L. Reach
Law Offices
106 N. Fourth Avenue
Suite 100
Ann Arbor, MI 48104

Mr. Gregory P. Ripple
Miller Johnson
45 Ottawa Avenue, S.W.
Suite 1100
Grand Rapids, MI 49503

        Re: Case No. 15-1250, *Pearlie Jackson v. Washtenaw County, et al*
            Originating Case No. : 2:12-cv-10963

Dear Sir or Madam,

    The Court issued the enclosed (Order/Opinion) today in this case.

Sincerely yours,

s/Cheryl Borkowski
Case Manager
Direct Dial No. 513-564-7035

cc: Mr. David J. Weaver

Enclosure

Mandate to issue

**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 17a0086n.06**

**No. 15-1250**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| PEARLIE JACKSON, | ) | |
| Personal Representative of the Estate of | ) | |
| Stanley Jackson, | ) | |
| | ) | |
|     Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| WASHTENAW COUNTY; DEPUTY THOMAS | ) | COURT FOR THE EASTERN |
| MERCURE; DEPUTY DEAN RICH; DEPUTY | ) | DISTRICT OF MICHIGAN |
| SEAN URBAN; HOLLY FARMER, | ) | |
| | ) | |
|     Defendants-Appellees. | ) | |
| | ) | |

> **FILED**
> Jan 31, 2017
> DEBORAH S. HUNT, Clerk

BEFORE:     BOGGS, WHITE, and DONALD, Circuit Judges.

    **BOGGS, Circuit Judge.**   When reporting to the scene of suspected drug activity, Deputies Sean Urban and Thomas Mercure approached Stanley Jackson to ask him questions regarding his potential involvement. Upon seeing the officers, Jackson turned and ran into his mother's house, followed by Deputy Urban. Soon after, other officers entered the house. In the course of his arrest and an attendant struggle, Jackson was tased four times. Once handcuffed, Jackson was taken to a hospital by ambulance, where he died shortly after being administered a sedative. Plaintiff Pearlie Jackson, Jackson's mother and personal representative of his estate, brought this action against Washtenaw County and Deputies Thomas Mercure, Dean Rich, Sean Urban, and Holly Farmer under 42 U.S.C. § 1983 for excessive force in violation of the Fourth and Fourteenth Amendments and under Michigan tort law for gross negligence, willful and

No. 15-1250, *Jackson v. Washtenaw County*

wanton misconduct, assault, battery, and intentional infliction of emotional distress.  The district court granted Defendants' motion for summary judgment on the § 1983 claim on the basis of qualified immunity and declined to exercise jurisdiction over the state-law claims.

Plaintiff appeals the grant of summary judgment, contending that there is a genuine issue of material fact as to whether Defendants' use of force against Jackson was objectively reasonable.  Because we find that Plaintiff produced no evidence creating such a dispute, we **AFFIRM** the district court's grant of summary judgment.

I

On August 20, 2010, Detective Michael Marocco was engaged in a drug investigation of Stanley Jackson ("Jackson") in Superior Township, Michigan.  Marocco was parked down the street from where Jackson was standing in his mother's driveway and the detective observed various persons approach Jackson.  On two occasions, Jackson removed an object from his pants and handed it to his visitor.  After the second interaction, Marocco contacted Deputy Sean Urban and advised him to make contact with Jackson and the other man.  Deputies Urban and Mercure arrived on the scene in uniform and approached the two men.  Deputy Urban was wearing a body microphone, the audio of which was transcribed.  Urban asked Jackson, "Hey, what's going on partner?  Come here a second."  Jackson clutched his waistband and began backing away toward the garage, saying "I didn't do it man."  Urban commanded Jackson to stop, but he turned and ran into his mother's house, repeating "I did not do it, man."  While Jackson fled, Urban observed that he kept his hands near his waistband.

Urban pursued him into the house, unholstered his Taser, and warned him, "Stop. I'll tase you."  In the kitchen, Jackson stopped and turned around, and Urban, allegedly fearing

No. 15-1250, *Jackson v. Washtenaw County*

Jackson would pull a weapon from his waistband, fired his Taser in probe mode.[1]  Struck by the probes, Jackson fell to the floor (Taser No. 1).  Urban repeatedly ordered Jackson to put his hands behind his back, but his muscles were rigid as a result of the Taser and Urban was unable to pull his arms around to handcuff him.  Mercure entered the house and handcuffed one of Jackson's wrists while Urban separately handcuffed the other.  The deputies then realized that Jackson was not blinking, had his eyes and jaw locked, and had begun to salivate.  Mercure called for an ambulance to arrive urgently and the two deputies asked Jackson if he was all right and told him to relax.  Jackson started to move once again and pulled his hands away from his back.  Using "muscling techniques," the deputies attempted to bring Jackson's wrists near enough together to handcuff them to each other, while Jackson shouted incoherently and struggled.  Mercure unholstered his Taser, and Urban warned, "Stop resisting.  I'm gonna [sic] tase you again."  Mercure tased Jackson on his upper back[2] for three seconds (Taser No. 2), but did not observe any effect on Jackson.

Deputy Holly Farmer arrived and assisted Urban and Mercure in trying to bring Jackson's arms together, but the three officers and Jackson rolled on the floor in the attempt.  The deputies ordered Jackson to turn on his stomach, and Mercure unholstered his Taser once more.  Jackson was turned onto his stomach as Mercure went to tase him and the Taser was

---

[1] The Taser at issue here (a TASER X26) has two modes of use: probe mode, which fires probes into the target's skin and thereby shocks him, and drive-stun mode, which involves the application of two electrode contacts onto a target and the running of a current between them.  A shock via probes can override the central nervous system, while a shock in drive-stun mode administers localized pain and will not override the nervous system. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012).

[2] Although the police reports indicated that the deputies used drive-stun mode for the ensuing uses of their Tasers, Plaintiff argues through her expert that probe mode (the more painful and incapacitating mode) was used for at least two if not all of the discharges.  In reviewing the record on appeal from summary judgment, we adopt the plaintiff's version of facts unless blatantly contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 378–80 (2007).  Because it is plausible from the face of the record, we will assume at least two of the discharges were in probe mode.

discharged for five seconds (Taser No. 3).[3]  While Jackson pulled and kicked, Farmer's arm became trapped between Jackson's head and arm.  Farmer saw Jackson open his mouth and bring it to her arm as if to bite it.  When he made contact, Farmer punched Jackson in the jaw and yelled, "Don't bite."  While this occurred, Deputy Dean Reich arrived and attempted to assist in restraining Jackson by securing his legs to prevent him from turning over.  Urban and Reich secured Jackson's left arm to his belt using the handcuffs on Jackson's left wrist.  Jackson continued to struggle using his right arm despite repeated orders from Urban: "Get your hands behind your back.  L[ie] down."  Urban then tased Jackson for five seconds (Taser No. 4).

The deputies pulled Jackson's right wrist behind him and handcuffed it to the pair of handcuffs on Jackson's left wrist.  Jackson continued to twist about, spitting and yelling, "Get off me."  Jackson was searched and no weapon was found on him, although a plastic bag with cocaine was found in his waistband, money was found in his front pocket, and a Michigan Department of Corrections tether on his ankle.

When paramedics arrived, they put a disconnected oxygen mask on Jackson to prevent him from spitting on them.  After the mask was removed to take his picture, Jackson spat at Urban's face and continued to struggle against his restraints in the ambulance, preventing paramedics from fully checking his condition.  Upon arrival at the hospital, he continued to be "extremely agitated," and spat at doctors in the emergency room.  Hospital records state that because Jackson was combative, security personnel were summoned and placed restraints on him.  Although doctors reported his breathing as unlabored, Jackson repeatedly stated that he could not breathe.  To calm Jackson, a physician prescribed 2 mg of Ativan (lorazepam), which was administered and caused him to relax.  But after two minutes, Jackson went limp and doctors

---

[3] Defendants contend that it is unclear whether this discharge actually contacted Jackson, but for the purposes of this appeal, we assume the third shock did contact Jackson.  *See* Appellant's Br. 3 ("Stanley Jackson . . . was tasered no [fewer] than four (4) times . . . .").

No. 15-1250, *Jackson v. Washtenaw County*

could not find a pulse. Jackson was pronounced dead after doctors were unable to resuscitate him. The reported cause of death on the autopsy was listed as cardiac arrest from nonocclusive ischemic heart disease associated with acute adrenergic stress reaction, with the Taser application recorded as a potential contributor to stress.

II

A. Standard of Review

We review a district court's grant of summary judgment de novo. *Mullins v. Cyranek*, 805 F.3d 760, 764 (6th Cir. 2015). A motion for summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party." *Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015) (quoting *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007)).

A claim under 42 U.S.C. § 1983 requires that a plaintiff allege that he was deprived of a federal right by someone acting under color of state or territorial law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). When government officials perform discretionary functions, they are entitled to a qualified immunity and are shielded from suit where "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

B. Analysis

The Fourth Amendment enshrines the people's right to freedom from unreasonable seizures. The use of force by police officers will constitute a seizure, and force that is

No. 15-1250, *Jackson v. Washtenaw County*

"'objectively [un]reasonable' in light of the facts and circumstances confronting" officers violates a federal right. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Courts endeavor to analyze "reasonableness at the moment" the force was used, "rather than with the 20/20 vision of hindsight." *Id.* at 396. In examining the use of force by an officer, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011) (quoting *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)).

The question in this case is whether Jackson was actively resisting arrest. Plaintiff asserts that Defendants used unreasonable force when they tased Jackson four times and punched him in the face because he was "neutralized" and had "submitted to [police] authority when he sustained his injuries." We have long distinguished active resistance by arrestees from passive resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). The former can be characterized by physical force, a show of force, or verbal hostility coupled with failure to comply with police orders. *See ibid.*; *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). The latter is generally shown by the lack of physical resistance or verbal antagonism. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012); *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). "When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot." *Rudlaff*, 791 F.3d at 642.

Because each tasing or punch can be a separate constitutional violation, we analyze them in turn. The first Taser application occurred after Jackson had fled into his mother's home, ignoring Urban's commands to stop. Suddenly, once in the house, he stopped and turned with

his hand by his waistband.  Where a suspect has refused to follow police orders and may be in possession of a weapon, we have determined there is no clearly established right to resist that can defeat qualified immunity.  *See Watson v. City of Marysville*, 518 F. App'x 390, 393 (6th Cir. 2013); *see also McGee v. City of Cincinnati Police Dep't*, No. 1:06-cv-726, 2007 WL 1169374, at *6 (S.D. Ohio Apr. 18, 2007).  While Jackson was in one sense complying with Urban's command to stop, his further turning around with his hand by his waist presented itself as an immediate threat to the officer.  And though it became clear after all four tasings that Jackson was unarmed, we must make "allowance for the fact that police officers are often forced to make split-second judgments" regarding their safety and that of others.  *Graham*, 490 U.S. at 397. Immediately prior to this moment, Jackson had been in the process of selling cocaine and other drugs, which have a "well recognized nexus" with firearms, *see, e.g.*, *United States v. Golter*, 880 F.2d 91, 94 (8th Cir. 1989), and the investigation had received a report that Jackson frequently kept a .38-caliber weapon with him during deals.  Given these factors and the immediacy of the potential danger to Urban, we cannot say that the first Taser deployment violated a clearly established right.

The second tasing occurred just under four minutes later.  After Jackson was struck by the first Taser in probe mode, he crumpled to the ground.  Urban and Mercure attempted to secure his arms, but his muscles were tense and they were unable to link the handcuffs on each wrist.  It became apparent to them that Jackson was in some distress, as he was not moving his eyes and had his arms locked from the Taser's shock.  The officers began asking Jackson if he was all right, telling him to relax, and that help was on the way.  About two minutes and forty-five seconds after the tasing, however, Jackson began moving again and wrestling with the officers.  After a warning that continued resistance would result in another tasing, Mercure used

No. 15-1250, *Jackson v. Washtenaw County*

his Taser on Jackson. It is clear that if Jackson were flailing or resisting solely as a result of the initial Taser shock and this was apparent to officers, they would then be in violation of Jackson's constitutional rights. In *Goodwin*, we found a violation of clearly established rights where a man was tased again for "resisting" where he was "obviously convulsing" from the effects of a Taser deployed seconds earlier. 781 F.3d at 327. But in *Wysong v. City of Heath*, 260 F. App'x 848 (6th Cir. 2008), we held that resistance by a man suffering a hypoglycemic attack could constitute active resistance where officers were not aware the man was in diabetic shock and the man testified he could not remember what transpired. *Id.* at 856–57.

Here, the initial tasering had a demonstrable effect on Jackson: his muscles contracted to the extent that the deputies could not move his arms, his jaw locked, and his eyes stared unblinking straight ahead. Any alleged resistance during this stage would have been due to the shock and any tasing would be unreasonable. But the police did not tase Jackson during this time; although they initially were prepared to tase Jackson again for failure to present his arms, they stopped once they realized he was unable to move on his own. The deputies attempted to calm Jackson and make sure that he was medically stable. It was when Jackson appeared to recover and began to "come out of his condition," pulling his arms toward his stomach and waist and away from the deputies, that Mercure tased Jackson again. We have held that a failure to present one's arms to an officer upon request without more is at most passive resistance, but that a physical struggle to maintain control of one's limbs while being placed in handcuffs can be active resistance. *Compare Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007), and *Eldridge*, 533 F. App'x at 535 ("[N]oncompliance alone does not indicate active resistance . . . ."), *with Caie v. West Bloomfield Township*, 485 F. App'x 92 (6th Cir. 2012); *see also Rudlaff*, 791 F.3d at 643 ("[P]olice officers can tase someone who resists lawful arrest and refuses to move his

No. 15-1250, *Jackson v. Washtenaw County*

hands so the police can handcuff him."). Even in *Goodwin* we acknowledged that "resist[ing] arrest by 'laying down . . . and deliberately locking [one's] arms together tightly under [one's] body while kicking and screaming" was active resistance. *Goodwin*, 781 F.3d at 326 (quoting *Eldridge*, 533 F. App'x at 534).

Based on the evidence before us, a reasonable officer on the scene could have believed that Jackson was actively resisting and no longer suffering from the Taser-induced shock. Although we assume the truth of the non-moving party's evidence, as the district court below noted, Plaintiff submitted no "other witnesses' statements to the contrary" and "[t]he expert reports . . . do not go to whether Mr. Jackson was resisting at the time he was arrested."[4] The closest evidence that Plaintiff provides is her expert's report that states "Mr. Jackson was struggling for his life, not against the deputies" and that a "person being Tased thrashes around from pain and the inability to breath[e]." That report relies entirely on the police and hospital reports for its factual basis, and cannot create new evidence from the old. It can, of course, suggest the best reading of that evidence for Plaintiff that we may adopt when reviewing a motion for summary judgment, but conclusory statements are insufficient. Jackson's initial physical reaction to the Taser was to lock up and become immobile. The deputies realized that this state was a result of the tasing and reacted sympathetically and helpfully. But when Jackson's status changed and he began to pull against their grip to bring his arms forward, the deputies believed that he had "[re]gained control of himself." Then, minutes later, Jackson began to "thrash[] around." If Jackson was still, or once again, reacting to the shock of the first Taser, it would not have been "objectively apparent to a reasonable observer." *Goodwin*, 781 F.3d at 324.

---

[4] The pertinent portions of the record before us are an audio transcript of the entire interaction between Jackson and the officers, and the officers' testimony, nothing else.

No. 15-1250, *Jackson v. Washtenaw County*

The third tasing took place fifteen seconds later, after continued struggling on the floor. The record before us shows that the Taser was used contemporaneously with Jackson being rolled onto his stomach. Unfortunately, Jackson is not available to provide his account, which may or may not have differed from that in the police reports and the audio tape. We have found in other cases that the accounts of the plaintiff or a witness can sustain a case beyond summary judgment where a court might have been compelled to grant qualified immunity based solely on the facts given by the reporting officers. *See, e.g.*, *Bolick v. City of East Grand Rapids*, 580 F. App'x 314 (6th Cir. 2014); *Griffith*, 473 F.3d 650. But based on the facts provided, even in the light most favorable to Plaintiff, we cannot say that the force used was unreasonable. As noted above, "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The deputies attempting to restrain Jackson found that the second tasing had been ineffective in stopping Jackson from resisting their efforts to handcuff him. Viewing the situation as Mercure tased Jackson again, if in fact Jackson was no longer resisting, or was complying with police commands, as opposed to continuing to struggle to break free, that would not have been apparent to a reasonable officer.

Shortly after this Taser use, Jackson moved his head toward Farmer's trapped arm and attempted to bite her. She punched Jackson in the jaw to prevent the bite. Farmer's actions were reasonable given there existed probable cause to believe that harm was imminently threatened. *See Chappell v. City of Cleveland*, 585 F.3d 901, 911 (6th Cir. 2009).

The fourth and final use of a Taser came just over a minute after the third tasing. By this time, the deputies had managed to secure one of Jackson's hands by handcuffing it to his belt. But Jackson continued to pull away from the deputies. Urban tased Jackson again before Farmer

No. 15-1250, *Jackson v. Washtenaw County*

and Reich were able to handcuff Jackson's right arm to the other pair of handcuffs on his left arm. We have found that where resistance continues, repeated attempts to induce compliance are permissible. *See, e.g.*, *Williams v. Sandel*, 433 F. App'x 353 (6th Cir. 2011) (providing qualified immunity to officers who tased a man thirty-eight times while he continued to resist and evade arrest); *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). Thus, there is no genuine issue of material fact that the actions taken by Defendants were reasonable responses to the resistance (real or perceived) made by Jackson, we affirm the district court's grant of qualified immunity.[5]

Given Defendants' entitlement to qualified immunity on the § 1983 claims, the district court did not err in declining to exercise jurisdiction over the supplemental state-law claims. "Generally, once a federal court has dismissed a plaintiff's federal law claim, it should not reach state law claims." *Sussman v. Dalton*, 552 F. App'x 488, 493 (6th Cir. 2014); *see also Rouster v. Cty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014).

### III

Based on the foregoing, we **AFFIRM** the district court's grant of summary judgment as to the excessive-force claim against the individual Defendants[6] and its dismissal of the remaining state-law claims.

---

[5] We note that Plaintiff produced no evidence that multiple tasings create an unreasonable risk of harm.

[6] Plaintiff failed to brief her municipal-liability claim, so her claim against Washtenaw County has been forfeited. *See Wright v. Knox Cty. Bd. of Educ.*, 23 F. App'x 519 (6th Cir. 2001).

No. 15-1250, *Jackson v. Washtenaw County*

**BERNICE BOUIE DONALD**, dissenting.   Accepting as true the facts presented by Plaintiff, as we must when faced with a motion for summary judgment, I believe that there remain material issues of fact as to whether Jackson actively resisted and whether the Defendants' actions were reasonable.   I would reverse the district court's grant of summary judgment as to the excessive force claim, and remand the case for further proceedings. I respectfully dissent.

I.

Qualified immunity shields officers and officials from civil liability only if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   Qualified-immunity determinations present two questions: (1) whether the officer violated the claimant's constitutional rights; and (2) whether that right was clearly established at the time of the incident. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310–11 (6th Cir. 2005).   Although the two questions are oftentimes conflated due to frequently overlapping analyses, this Court has noted the importance of analyzing them separately.   *See Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012)   (explaining that if a court does not carefully define the right, it risks collapsing the two qualified-immunity inquiries into one, and permits the constitutional-violation inquiry to always answer the clearly established inquiry).   As the majority correctly notes, the Fourth Amendment clearly establishes the right to be free from excessive force.   What is less clear is whether an individual, who becomes incapacitated by taser-induced effects and subdued, has a constitutional right to be free from subsequent tasings; and if so, whether that right was clearly established at the time of this incident.

-12-

No. 15-1250, *Jackson v. Washtenaw County*

A.    Constitutional Violation

I agree with the majority that the major question presented in this case is whether Jackson *actively* resisted arrest. Where we part ways is with the finding that the record conclusively shows that Defendants' continuous tasing of an already-incapacitated and pinned-down suspect was a reasonable response to the resistance they perceived.

Plaintiff points to expert testimony and contends that Jackson did not actively resist arrest but only failed to present his hands for handcuffing or follow Defendants' orders due to taser-induced effects. (*See* Appellant's Br. 9–10.) Alleging differently, Defendants compare Jackson's actions to the resistance of claimants in cases in which this Court has found qualified immunity, among them *Hagans*, 695 F.3d at 509 and *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). I believe that both of these cases present sufficiently different circumstances, and analyze them in turn.

In *Hagans*, as soon as the officer arrived at the scene, the suspect began running toward the officer. 695 F.3d at 507. Despite being ordered to stop, the suspect continued running. *Id.* He then bolted for the backyard. *Id.* The officer chased after him and shot him with pepper spray on his backside. *Id.* He ran to the officer's cruiser and began yanking on the locked driver's side door handle, refusing to obey the officer's commands to stop, which prompted the officer to grab him by the waist and wrestle him to the pavement to try to subdue him. *Id.* The suspect refused to be handcuffed and locked his arms tightly under his body, kicking his feet and continuing to scream. *Id.* While two officers struggled with the suspect on the ground, a third officer approached, and seeing the suspect actively resisting arrest, unholstered his taser, applied the taser in drive-stun mode, pressing the taser directly against the suspect's upper back. *Id.* Eventually, they secured the suspect's wrists with handcuffs. *Id.*

-13-

No. 15-1250, *Jackson v. Washtenaw County*

In *Rudlaff*, the incident in question began when the officer stopped the suspect during a traffic stop. 791 F.3d at 640. The officer informed the suspect through his open window that he was under arrest for driving with a suspended license. *Id.* The officer then opened the driver's side door and told the suspect to get out. *Id.* According to the officer, the suspect appeared "highly agitated" and was "swearing" in response to the officer's request, but voluntarily exited the truck. *Id.* The officer instructed the suspect to place his hands on the truck but the suspect refused to comply. *Id.* The officer then grabbed the suspect's right arm and tried to move it onto the truck. *Id.* The suspect swung his arm back in the officer's direction, admittedly trying to "prevent [the officer] from handcuffing" him. *Id.* The officer then succeeded in getting the suspect to place both his hands on the truck and attempted to grab his left arm to place it in handcuffs. *Id.* The suspect swung his arms again in the officer's direction to resist being handcuffed, which prompted the officer to command twice, "give me the hands." *Id.* The suspect refused. *Id.* The officer then performed a knee strike on the suspect, but the knee strike did not subdue the suspect. *Id.* The officer warned, "relax, or else you're gonna [sic] get tasered." *Id.* Moments later, the officer tased him. *Id.* He immediately fell to the ground and the officers handcuffed him. *Id.*

What happened in *Hagans* and in *Rudlaff* falls short of capturing the *kind of resistance* that occurred in this case. Although *Hagans* and *Rudlaff* involved resisting arrestees, Jackson's resistance tells a different tale. Jackson was never told that he was under arrest. (R. 28-3, PageID 392–99.) Jackson stopped running when Officer Urban warned him that he was going to tase him. (*Id.* at 393.) Jackson did not resist the officers until after he had become completely unconscious, unresponsive, and exhibited signs of extreme physiological distress. (*Id.* at 394.)

-14-

No. 15-1250, *Jackson v. Washtenaw County*

Defendants describe how Jackson resisted attempts by four different Washtenaw County Sheriff's Deputies to arrest and handcuff him. (Appellee's Br. 5–9.) What they fail to note, however, is the *point* at which Jackson began resisting: after he had been tased. After he had become incapacitated. After his limbs had become too stiff and rigid to move. And after he had at least two officers on top of him, jerking his flailing arms back behind his back. (*Id.*)

Considering the distinction between active and passive resistance, it is obvious that an individual who cannot control his or her body during a tasing episode is not capable of active resistance. *See Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015). Although our case law does not dictate how police should react in every circumstance, our case law does not espouse a rationale of heedlessly tasing someone until they stop kicking and convulsing, especially once they pose no real threat to the officers' safety. The facts of this case, including Jackson's condition and the officers' actions, raise a genuine issue of fact for a jury.

In *Goodwin*, for instance, we found that although the suspect failed to present his arms for handcuffing as officers instructed him, there was ample evidence in the record to support his claim that he did not have enough control of his body to comply during the tasing episode. *Id.* In fact, when being tased, the suspect landed on his back and started to bring his arms up under his chin in an apparent involuntary manner, and then he began convulsing uncontrollably while the officers incessantly told him to "quit resisting." *Id.* at 319. In his wife's deposition, she testified that he was not resisting but convulsing. *Id.* at 324. To further support his account, the suspect submitted the following witness testimony describing his convulsions: "Foam was coming out of his mouth . . . . He couldn't put his hands behind his back because they shocked him so bad." *Id.* Viewing these facts in the light most favorable to the suspect in that case, we

-15-

No. 15-1250, *Jackson v. Washtenaw County*

concluded in *Goodwin* that the suspect's taser-induced convulsions amounted to *passive* resistance, which by no means warranted the force used against him. *Id.*

Consider, also, *Austin v. Redford Township Police Department*, where we found that although the suspect did not immediately comply with the officer's commands, he was not *actively* resisting because he was too disoriented from at least two prior taser deployments and one police dog attack to properly obey officers' orders. 690 F.3d 490, 498 (6th Cir. 2012). The suspect had already been placed in the patrol car leaving only his feet outside the car. *Id.* He was experiencing and complaining of shortness of breath, yet, the officers tased him a third time alleging that he actively resisted their command to place his feet inside the patrol car. *Id.* In that case, we noted that even without precise knowledge that the use of a taser would be a violation of a constitutional right, the officer should have known based on analogous cases that his actions to tase a subdued, disoriented person was excessive, and thus, unreasonable. *Id.*

Lastly, I point to this Court's decision in *Shreve v. Jessamine County Fiscal Court*, in which the suspect became disoriented and incapacitated as a result of being pepper sprayed by officers. 453 F.3d 681, 687 (6th Cir. 2006). When the suspect failed to present her hands for handcuffing after being pepper sprayed, the officers continued to beat her with a stick ten to twelve times while she was on the ground and "out of it." *Id.* Under the objective reasonableness standard, we found that the beating, which the suspect suffered after becoming incapacitated and subdued by pepper spray was not reasonable, but was rather a violation of a clearly established right to be free from excessive force. *Id.*

Turning back to the facts of this case, a jury could conclude that Jackson's uncontrollable convulsions, as described by Defendants, caused him to only *passively* resist the officers after he was tased. This case does not appear to be the type of case that lends itself to a summary review

No. 15-1250, *Jackson v. Washtenaw County*

of a police incident report to yield a one-sided conclusion as to whether a suspect actively resisted arrest. The fact that Jackson was suffering from taser-induced effects at the moment he started resisting is telling as to his volitional capacity to resist, which, as Plaintiff argues, creates a question of fact for a jury.

Plaintiff submitted a report from law enforcement expert, Ernest Burwell, who ultimately opined the extent to which Jackson may have resisted out of a mere struggle for his life and not one against the officers. (R. 34, PageID 779–80.) In the report, he described how Jackson most likely lacked control of his body movement and suffered from difficulty in breathing after being tased. (*Id.*) Burwell stated that "depending on its method of use, the taser gun has the capacity to overcome the central nervous system, meaning that it can cause the human body to become rigid and inflexible." (R. 34, PageID 779.) He described how a person being tased can react in the following various ways: falling immediately to the ground, yelling, screaming, being silent, freezing in place during the discharge of the current, kicking, suffering from eye injury, suffering from any secondary injuries caused by falling, temporary tingling, and lacking memory or sensation of pain. (*Id.*) Noting the difference between probe-mode and drive stun-mode, he opined that, contrary to the police report, Jackson may have been tased at least three times in probe-mode, which is the more painful mode. (*Id.* at 775.)

Hearing this evidence, a jury could conclude that, at the time of each deployment of the taser gun, Jackson had already become subdued. Also, if we are to accept Plaintiff's version of the facts, including her expert report, as true, we must presume that any resistance was taser-induced. To be clear, we may allow for the fact that police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving as to the amount of force necessary in a particular situation. *Graham v. Connor*, 490 U.S. 386, 397 (6th

No. 15-1250, *Jackson v. Washtenaw County*

Cir. 1989). But just like in *Goodwin*, it is not clear to me that Jackson's pulling away of his arms from the officers' grasp and kicking was not due to involuntary convulsions from having been tased three times prior.

As the majority notes, we do not have testimony from decedent Jackson describing, in his own words, which movements he could and could not control as we have had in previous cases. Regardless, considering the facts of the incident in the light most favorable to Plaintiff, both the expert report and the timing of Jackson's resistance are sufficient to suggest that Jackson may not have been actively resisting arrest. Therefore, I cannot agree that the interaction at issue follows the typical course of active resistance that would justify multiple tasings.

B.      Clearly Established Right

The second question asks whether that right was "clearly established" at the time of the alleged violation. *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012). To be a clearly established right, "[t]he contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law[,] the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

Fourth Amendment jurisprudence makes clear that the right to be free from excessive force even if passive resistance occurs is not a newly discovered right. *See Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (holding that using force after a suspect has been "incapacitated by mace would be excessive as a matter of law"). This Court's precedent denouncing the use of

-18-

No. 15-1250, *Jackson v. Washtenaw County*

excessive force on subdued and involuntarily resisting individuals has dated back to at least 2002. *Id.*

Therefore, a reasonable officer would have known that repeatedly tasing someone who had already exhibited all the signs of being incapacitated and in distress would violate the right to be free from excessive force. Defendants could not have reasonably believed that their repeated tasings of Jackson, after recognizing Jackson's dire need for medical assistance and pinning him down, was not wrong. This is not a case where the evidence is so objectively compelling that no reasonable juror could believe Plaintiff. The Plaintiff has presented sufficient evidence for a jury to rationally determine that Defendants used excessive force against Jackson and should be denied qualified immunity.

II.

This case is not as clear-cut as the majority would make it seem. The record viewed in the light most favorable to the non-moving party, Jackson, demonstrates that a genuine issue of material fact exists as to the reasonableness of Defendants' decision to continuously tase Jackson. For this reason, I respectfully dissent.